UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| JOHN FILLER and LESLIE FILLER, husband and wife,<br><br>               Plaintiffs,<br><br>   v.<br><br>MIREN M. UNSWORTH, in her individual capacity; SUSAN DWELLO, in her individual capacity; JASMINE OLMEDO, in her individual capacity; MARINA SQUIBB, in her individual capacity; and Jane Does I-XX, in their individual capacities.<br>                      Defendant. | Case No. 1:21-cv-00391-DCN<br><br>**MEMORANDUM DECISION AND ORDER** |

## I. INTRODUCTION

This matter comes before the Court on Defendants Miren Unsworth, Susan Dwello, Jasmine Olmedo, Marina Squibb, and Jane Doe's I-XX's ("Defendants") Motion to Dismiss. Dkt. 16. Having reviewed the record and briefs, the Court finds that the facts and legal arguments are adequately presented. Accordingly, in the interest of avoiding further delay, and because the Court finds that the decisional process would not be significantly aided by oral argument, the Court will decide the Motion without oral argument. Dist. Idaho Loc. Civ. R. 7.1(d)(1)(B). Upon review, and for the reasons set forth below, the Court GRANTS the Motion.

## II. BACKGROUND[1]

Plaintiffs John and Leslie Filler are foster parents. On August 21, 2019, John Filler discovered that one of his legal wards (D.F.) might have sexually molested another foster child in their care by performing fellatio on him. Both children were sexually aggressive and had substantial intellectual and mental disabilities. Filler telephoned the police and an on-call worker for the Idaho Department of Health & Welfare ("IDHW") to report the sexual act as a crime. Upon arrival, the on-call worker instructed Filler to take D.F. to a hotel for an undetermined length of time so they could potentially find an alternative living placement for D.F. The intake worker advised Filler that if he did not follow her directive to go to a hotel, he would be "substantiated," causing the Fillers to lose their license as foster parents and placing them on the Child Protection Central Registry ("Central Registry"). Dkt. 1, at 5.

The parties could not decide on a course of action for D.F. because all seemed to agree he presented a danger to himself and/or others. A police officer, who had arrived on scene, placed D.F. into temporary custody under the jurisdiction of Idaho's Child Protection Act. D.F. has reportedly remained in the custody of IDHW since the incident.

On September 29, 2019, IDHW sent a letter to Filler advising him that he had been "named in an allegation of abuse, neglect, or abandonment [which] was determined to be substantiated" and was based on a confession in relation to a child, D.F. and that he had 28 days to seek administrative review, or his name would be placed on the Child Protection

---

[1] All facts are taken from Plaintiffs' Complaint (Dkt. 1) and viewed in the light most favorable to them as the non-moving party. *Scott v. Harris*, 550 U.S. 372, 380 (2007).

Registry of child abusers as a "Level II Risk." *Id.*, at 14–15. A similar letter was sent to Leslie Filler, except she was being placed on the Central Registry as a "Level III Risk." *Id.*, at 17–18. On September 30, 2019, IDHW notified the Fillers by letter that, based on the results of the CSA and the CARES reports, their foster care license was being suspended and revoked, effective immediately. *Id.*, at 7. The Fillers had previously hosted numerous foster children without incident over the course of many years.

The Fillers appealed both sets of letters. IDHW conducted an administrative review of the matter, and advised the Fillers that after the review, the departmental administrator had determined that the actions were substantiated, except that John Filler's classification on the Central Registry was reduced to a "Level III Risk." Dkt. 1, at 19. On November 20, 2019, the Fillers were given notice that they had been placed on the Central Registry. *Id.*, at 19–20. The Fillers appealed IDHW's determination and requested a fair hearing on December 16, 2019. *Id.*, at 7. The hearing was conducted on February 25, 2020, where, following live testimony from various IDHW witnesses, the hearing officer issued a preliminary order on April 24, 2020, upholding IDHW's substantiation of abuse and revocation of foster care license. *Id.*, at 7–8. The Fillers allege that instead of limiting testimony to the August 21, 2019, date referenced in the letter, IDHW introduced events going back decades over their objections to prove its case. *Id.*, at 8.

On May 22, 2020, the Fillers filed a Petition for Review with the Canyon County District Court. *Id.* Following a briefing schedule, district court Judge Duff McKee issued a memorandum decision and order on the Petition for Review dated December 23, 2020. *Id.*, at 22–38. In his decision, Judge McKee held that the Fillers due process rights had been

violated when their foster care license was revoked and when they were placed on the Central Registry without procedural or substantive due process. *Id*. The December 23, 2020, Order also noted that IDHW was previously advised in June 2019 in another similar case—*Daniel v. IDHW* (Canyon County Case No. 14-18-12103, District Judge Duff McKee presiding)—that the process used to place parties on the Central Registry was unconstitutional. *Id*., at 40–68. The district court also awarded attorney's fees and costs in favor of the Fillers. *Id.* The Fillers were subsequently removed from the Central Registry. *Id*.

The Fillers then filed the instant Complaint in Federal Court against Defendants on September 28, 2021. Dkt. 1. The Fillers state—under the heading "Nature of the Claims"—that they are bringing suit under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 1983 ("§ 1983"), the Fourteenth Amendment to the U.S. Constitution, and applicable state law. Dkt. 1, at 2. However, the individual claims are simply titled "Procedural Due Process Violations – Child Protection Central Registry." *Id.* at 8-12. Plaintiffs brought an identical claim against each  Defendant, Olmedo, Squibb, Dwello, and Unsworth, in their individual capacity for their involvement throughout IDHW's process. *Id*.

The Defendants filed a Motion to Dismiss for Failure to State a Claim. Dkt. 16.

### III. LEGAL STANDARDS

Federal Rule of Civil Procedure 12(b)(6) permits a court to dismiss a claim if the plaintiff has "fail[ed] to state a claim upon which relief can be granted. A Rule 12(b)(6) dismissal may be based on either a 'lack of a cognizable legal theory' or 'the absence of sufficient facts alleged under a cognizable legal theory.'" *Johnson v. Riverside Healthcare*

*Sys., LP*, 534 F.3d 1116, 1121 (9th Cir. 2008) (citation omitted). Federal Rule of Civil Procedure 8(a)(2) requires a complaint to contain "a short and plain statement of the claim showing that the pleader is entitled to relief," in order to "give the defendant fair notice of what the . . . claim is and the grounds upon which it rests." *See Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 554 (2007). "This is not an onerous burden." *Johnson*, 534 F.3d at 1121. A complaint "does not need detailed factual allegations," but it must set forth "more than labels and conclusions, and a formulaic recitation of the elements." *Twombly*, 550 U.S. at 555. The complaint must also contain sufficient factual matter to "state a claim to relief that is plausible on its face." *Id.* at 570. In considering a Rule 12(b)(6) motion, the Court must view the complaint in the light most favorable to the claimant and "accept[] all well-pleaded factual allegations as true, as well as any reasonable inference drawn from them." *Johnson*, 534 F.3d at 1122.

Finally, in determining whether a Rule 12(b)(6) dismissal should be granted, the Court may not look at matters outside the complaint, *Schneider v. Calf. Dep't of Corrections*, 151 F.3d 1194, 1197 (9th Cir. 1998). However, the Court can take judicial notice of any document not attached to the complaint if the complaint specifically refers to it and its authenticity is not questioned. Fed. R. Evid. 201(f); *Townsend v. Columbia Operations*, 667 F.2d 844, 848-49 (9th Cir. 1982).

### IV. ANALYSIS

To establish a prima facie case under § 1983, the Fillers must establish that: (1) the conduct complained of was committed by a person acting under color of state law; and (2) the conduct violated a right secured by the Constitution and laws of the United States. *West*

*v. Atkins,* 487 U.S. 42, 48 (1988). There is no question that the Filler's listing on the Central Registry occurred under color of state law. Thus, the issue here is whether the initial and continued inclusion of the Fillers on the Central Registry deprives them of any rights secured by the Constitution and laws of the United States. The Court finds that it does.

Accordingly, after discussing the existence of a constitutional violation, the Court will consider Defendants primary challenge: whether the individual Defendants are entitled to immunity for their acts. The Court finds that they are. As a result, the Motion must be granted.

### A. Procedural Due Process

The Fillers argue Defendants violated their Fourteenth Amendment right to procedural due process by listing them on the Central Registry without any substantive available process to challenge that listing. In procedural due process claims, the deprivation of a constitutionally protected interest "is not itself unconstitutional; what is unconstitutional is the deprivation of such an interest *without due process of law.*" *Zinermon v. Burch,* 494 U.S. 113, 125 (1990). The analysis proceeds in two steps: "the first asks whether there exists a liberty or property interest which has been interfered with by the State; the second examines whether the procedures attendant upon that deprivation were constitutionally sufficient." *Ky. Dep't of Corr. v. Thompson,* 490 U.S. 454, 460 (1989) (cleaned up).

*1. Deprivation of a Protected Liberty Interest*

To determine whether there was deprivation of a protected liberty interest, the Court will apply the "stigma-plus" test of *Paul v. Davis,* 424 U.S. 693 (1976). The Fillers argue

that the stigma of being listed on the Central Registry as substantiated child abusers, *plus* the various statutory consequences of being listed on the Central Registry constitutes a liberty interest, of which they may not be deprived without due process of law. The Court agrees.

In *Wisconsin v. Constantineau,* the Supreme Court held that a liberty interest may be implicated "where a person's good name, reputation, honor, or integrity is at stake because of what the government is doing to him." 400 U.S. 433, 437 (1971). The following year, the Court stated that a government employee's liberty interest would be implicated if he were dismissed based on charges that "imposed on him a stigma or other disability that foreclosed his freedom to take advantage of other employment opportunities." *Board of Regents v. Roth,* 408 U.S. 564, 573 (1972). In *Paul v. Davis,* the Supreme Court clarified that procedural due process protections apply to reputational harm only when a plaintiff suffers stigma from governmental action *plus* alteration or extinguishment of "a right or status previously recognized by state law." 424 U.S. 693, 711 (1976) (emphasis added). This holding is  known as the "stigma-plus test." *See Hart v. Parks,* 450 F.3d 1059, 1070 (9th Cir. 2006).

a. Stigma

Being labeled a child abuser as a result of placement on a Central Registry is "unquestionably stigmatizing." <u>Humphries v. Cnty. of Los Angeles</u>, 554 F.3d 1170, 1186 (9th Cir. 2009), <u>as amended</u> (Jan. 30, 2009), <u>rev'd and remanded on other grounds, Los Angeles Cnty., Cal. v. Humphries</u>, 562 U.S. 29 (2010). The Ninth Circuit has observed that there is "[n]o doubt . . . that being falsely named as a suspected child abuser on an official

government index is defamatory." *Miller v. California,* 355 F.3d 1172, 1178 (9th Cir.2004); *see also Valmonte v. Bane,* 18 F.3d 992, 1000 (2d Cir.1994) (finding it beyond dispute that inclusion on a child abuse registry damages one's reputation by "branding" an individual as a child abuser).

The Supreme Court has also identified stigma on the basis of lesser accusations. For example, in *Constantineau,* the chief of police had posted the plaintiff's name on a list that prohibited her from purchasing alcohol pursuant to a state statute forbidding the sale of alcoholic beverages to persons who had become hazardous by reasons of their "excessive drinking." 400 U.S. at 434–35. And in *Paul,* the plaintiff's picture appeared on a flyer of individuals who were suspected of shoplifting. 424 U.S. at 695. In both cases the Court found stigma. *Constantineau,* 400 U.S. at 435–37; *Paul,* 424 U.S. at 697, 701 (stating that imputing criminal behavior to an individual is generally considered "defamatory per se" and implicitly finding stigma by holding that stigma alone is insufficient). Being labeled a child abuser is indisputably more stigmatizing than being labeled an excessive drinker or a shoplifter. Indeed, child abusers are undeniably cast from all sectors and classes of society.

b. Plus

The more difficult issue is whether the Fillers can satisfy the "plus" test. The Fillers must show that, as the result of being listed on the Central Registry, "a right or status previously recognized by state law was distinctly altered or extinguished." *Paul,* 424 U.S. at 711; *see also Siegert v. Gilley,* 500 U.S. 226, 233 (1991) (reaffirming that an injury to reputation by itself is not a protected liberty interest under the Fourteenth Amendment).

As the Court explained in *Paul,* when the chief of police in *Constantineau* posted

the plaintiff's name on a list forbidding the sale of alcohol to her, it "significantly altered her status as a matter of state law" by depriving her "of a right previously held under state law[—]the right to purchase or obtain liquor in common with the rest of the citizenry." 424 U.S. at 708. The Court concluded that "it was that alteration of legal status which, combined with the injury resulting from the defamation, justified the invocation of procedural safeguards." *Id.* at 708–09.

In *Paul*, the Louisville Chief of Police placed Davis's name on a flyer distributed to Louisville merchants containing a list of individuals thought to be active in shoplifting. *Id.* at 695. In contrast to the mandatory nature of the statute in *Constantineau,* the flyer merely "came to the attention" of Davis's supervisor who warned him not to repeat his actions in the future. *Id.* at 696. The Court found that this harm to Davis's reputation was not sufficient to create a liberty interest. *Id.* at 712. Notably, no law had required the Chief of Police to distribute this flyer, nor did any law require employers to check the list. Thus, although any impairment to Davis's employment opportunities "flow[ed] from the flyer in question," his injury only occurred because the flyer happened to have "c[o]me to the attention of [his] supervisor." *Id.* at 696–97.

The Fillers allege more than mere reputational harm in this case. They assert that being listed on the Central Registry alters their rights primarily because it affects their ability to obtain specific licenses. State statutes mandate that licensing agencies search the Central Registry—as directed by the rules of such agencies—and use such information prior to granting a number of rights and benefits. These rights include gaining approval to provide foster care. *See* Idaho Code § 39-1211(4); 56-1004A; IDAPA 16.06.02.100;

IDAPA 16.06.02.400; IDHW's Standard For The Recruitment And Licensing Of Resource Parents. Although these agencies are not explicitly required by Idaho's Child Protective Act to consult the Central Registry, they may, as a practical matter, be required to do so by their own regulations or practices. Thus, inclusion in the Central Registry alters the Fillers legal rights or status in a variety of ways that those who are not listed on the Central Registry are not subject to. This includes applying for custody of a relative's child, becoming guardians or adoptive parents (inside or outside of Idaho), becoming licensed or employed in a position caring for children, and involvement in adoption and child placement. The Fillers were directly affected in their eligibility to continue as foster care parents because their foster care license was revoked. The Fillers also reported that Leslie Filler was affected in her ability to maintain her nursing credentials and to work with children as part of her employment.

The Court recognizes that being listed on the Central Registry may not fully extinguish the Fillers rights or status. Agencies that obtain information from the Central Registry are not privy to details regarding events that led to placement on the registry. IDAPA 16.06.01(561). Additionally, the registry is not freely available public information and may not be accessed without the written consent of the person on the registry. *Id.* However, it is information that may be (and is) required by state agencies when conducting background checks to grant certain permissions or licenses, including to provide foster care or adopt. I.C. 56-100(4). Thus, for example, inclusion on the Central Registry does not necessarily bar the Fillers from obtaining a license for childcare, but it does guarantee that the licensing entity will conduct an investigation anew by checking the Central Registry

before issuing or denying any request for the license. However, the Court need not find that an agency will necessarily deny the Fillers a license to satisfy the "plus" test. Outright denial would mean that a listing on the Central Registry has extinguished the Fillers legal right or status. Rather, *Paul* provides that stigma-plus applies when a right or status is "altered *or* extinguished." 424 U.S. at 711 (emphasis added). Here, the Fillers lost their foster care license after being placed on the Central Registry, and Leslie Filler's career as a nurse practitioner was in jeopardy.

The Court holds that where a state statute creates both a stigma and a tangible burden on an individual's ability to obtain a right or status recognized by state law, an individual's liberty interest has been violated. A tangible burden exists in this context where a law effectively requires agencies to check a stigmatizing list and investigate any adverse information prior to conferring a legal right or benefit. Idaho created the Central Registry via the Child Protective Act and requires agencies to create their own rules associated with the Central Registry and perform an investigation before granting a number of licenses and benefits. Currently, the Idaho Department of Health and Welfare requires a Central Registry check in order to foster or adopt children, work in "child care employment," work for state hospitals, work as an Emergency Medical Services provider, or to become a Guardian ad Litem or court-appointed special advocate. *See* Idaho Department of Health and Welfare, Criminal History Unit, https://healthandwelfare.idaho.gov/chu (last visited Jul. 19, 2022); IDAPA 16.05.06.101. Additionally, other agencies or places of employment may have their own requirements to check the Central Registry. This places a tangible burden on Plaintiffs' legal rights, and, as a result, satisfies the "plus" test.

In sum, the Court concludes that the Fillers legal rights or status have been altered. Idaho created the Central Registry and requires that agencies involved in issuing licenses or privileges search the Registry before issuing a license or benefit under state law. Thus, being listed on the Central Registry places an added burden on entities wishing to confer legal rights or benefits, makes the chances of receiving a benefit conferred under Idaho law significantly less likely, and practically guarantees that conferral of that benefit will be delayed or denied. Therefore, the Fillers have satisfied the first step of the procedural due process analysis: they have a liberty interest in both their good name and using it to obtain a license, secure employment, become guardians, volunteer or work for CASA, or adopt. Listing the Fillers on the Central Registry places a tangible burden on their ability to exercise this liberty interest.

### i.    2. Adequacy of Procedural Safeguards

Next, the Fillers must show that the procedural safeguards attending their liberty interest established by the state are constitutionally insufficient to protect their rights. *Thompson*, 490 U.S. at 460. Idaho currently provides some minimal safeguards against erroneously listing someone on the Central Registry. For example, when an individual is facing deprivation of a license issued by the State, that individual "shall be notified of the specific facts or material noticed and the source thereof, including any staff memoranda and data." Idaho Code § 67-5251 (4). However, IDHW used vague terminology and "catch all" phrases in the letters sent to the Fillers that are insufficient to provide the notice required by law.

The Court will evaluate the process that Idaho provides persons listed on the Central

Registry under the three-part test set out in *Mathews v. Eldridge,* 424 U.S. 319, 335 (1976). *Mathews* instructs courts to balance (1) the private interest affected by the official action; (2) the risk of erroneous deprivation and the probable value of additional procedural safeguards; and (3) the governmental interest, including the fiscal and administrative burdens of additional procedures. *Id.* The procedural due process inquiry is made "case-by-case based on the total circumstances." *California ex rel. Lockyer v. F.E.R.C.,* 329 F.3d 700, 711 (9th Cir. 2003). The Court will consider the private and governmental interests first, followed by a discussion of the risk of error in the procedures established by the state.

a. Private Interest

The Filler's argument in support of their private interest at stake is essentially coextensive with their argument in support of their liberty interest. As has been discussed, the Fillers have an interest in not being stigmatized by having their names included in a child abuse database that places a tangible burden on legal rights if they have not committed the acts underlying the reports that led to their inclusion. Thus, they have an interest in pursuing employment and adoption, seeking to obtain custody of a relative's children, and securing the appropriate licenses for working with children without having to be subject to an additional investigation, delays, and possible denial of a benefit under Idaho law due to an incorrect listing on the Central Registry.

b. Governmental Interest

There is no doubt that Idaho has a strong interest in preventing child abuse and that the creation or maintenance of a central index, such as the Central Registry, is an effective and responsible means for Idaho to secure its interest. *See Santosky v. Kramer,* 455 U.S.

745, 766 (1982); *Idaho Dep't of Health & Welfare v. Doe I*, 408 P.3d 81 (Idaho 2017) (finding that the Central Registry was established to assist the Department in protecting children from individuals who have previously abused, neglected, or abandoned children).

Further, it is in Idaho's interest to maintain reports that may even be inconclusive, unsubstantiated, or unfounded. *See Humphries* 554 F.3d at 1194-95. Such a record may reveal patterns of disturbing behavior that would otherwise be difficult to perceive and may be useful to law enforcement. *Id.* However, it is of no interest to the state to maintain reports that include false information. The effectiveness of such a system would suffer, resulting in less available care and resources for the state's children in need.

c. Risk of Erroneous Deprivation through procedures used

The most important consideration form *Mathews* is the risk of erroneous deprivation through departmental procedures used. In *Humphries*, the Ninth Circuit found that there was a significant risk that parties included on the child abuse registry were erroneously deprived of their "reputation-plus," because the process of appeal was unlikely to yield a change in the inclusion of their names on the registry regardless of the facts. 554 F.3d at 1200.

In Idaho, none of the means for correcting erroneous information in the Central Registry is well designed to do so. The parties are largely left to the discretion of an internal review process without any significant opportunity to present reasoned objections—up until the last-resort option of challenging the department's decision in district court. *See Chalkboard, Inc. v. Brandt*, 902 F.2d 1375, 1381 (9th Cir. 1989) (finding that in the delicate determination of whether child abuse occurred—which is subject entirely to the credibility

of witnesses—the risk of error is considerable when such determinations are made after hearing only one side.). A party is listed on the Central Registry by notification prior to placement that they have been "substantiated" by a worker as having committed an act of abuse, neglect, or abandonment.; Dkt. 1, at 4. If this occurs in Idaho, the accused is then given 28 days to request a review of the substantiation before they are placed on the Central Registry. If the individual does not request an administrative review by the administrator within 28 days from the date on the notification, their name is automatically placed on the Central Registry without further notice or right for appeal. *See* IDAPA 16.06.01.564.02.

If a review is requested, a Family and Community Services (FACS) Division Administrator reviews the file. *See* IDAPA 16.06.01.564.03. There is no hearing and no evidence is received. *Id.* The individual requesting the review is not notified when the review will occur and is not given an opportunity to participate. *Id.* The FACS Division Administrator decides from a review of the file whether to affirm, reverse, or modify the worker's "substantiation." *Id.* If the supervisor determines that the case worker's decision was correct, the individual is notified by mail of the IDHWs position and the person is placed on the Child Protection Central Registry. *See* IDAPA 16.06.01.561.05. The only meaningful notice that is given to the accused is what is placed into the pre-substantiation letter. Dkt. 1, at 14. Essentially, the accused sends back a short letter stating "I object" and the Division Administrator then reviews the worker's determination with no other input from the accused. Dkt. 1, at 4.

Once an individual has been notified by mail that they have been placed on the Child Protection Central Registry, they are informed of the procedures for filing a contested case

appeal under the "fair hearing" procedure before the Administrative Procedures Section. *See* IDAPA 16.06.01.564.05(b). At the fair hearing (conducted by telephone), the hearing officer does not review the substantive reasons a person was placed on the Child Protection Central Registry, but reviews whether the correct procedures were filed by the IDHW as stated in IDAPA. After a fair hearing is conducted, a Preliminary Order is issued that becomes final after fourteen (14) days if the party does not choose to seek further review before the Director of IDHW. *See* IDAPA 16.05.03.150-151. A final order may be reviewed by filing a Petition to Review with the District Court (which the Fillers did in this case). Dkt. 1, at 5.

Up until the point of petitioning the District Court to review the department's decision, the IDHW's process of appeal leaves much room for error and bias. There are no objective standards in place to review the credibility of a claim, either before or after the claim has been "substantiated." There is little, if any, opportunity for the accused to present their case for appeal using evidentiary support to lend credibility to their objections. There is no "preponderance of the evidence" standard the department adheres to when deciding whether to keep someone's name on a list of child abusers.[2] *See Valmonte v. Bane*, 18 F.3d 992, 1004 (2nd Cir. 1994) (finding that a standard requiring merely "some credible

---

[2] The decision to place the Filler's on the Central Registry had been made internally by IDHW prior to the opportunity to request a hearing. Once an appeal was available, it was merely to determine whether the proper procedures had been followed by IDHW when placing the Fillers on the registry, not to consider evidence offered by the Fillers regarding the registry determination and surrounding events. At the hearing pursuant to IDAPA 16.05.03.132, the burden of proof (by a preponderance of the evidence) was on the Fillers to prove that there was some *exemption* they were entitled to that could *remove* them from the Central registry—there was no standard of proof requirement to evaluate whether they should have been placed on the registry in the first place.

evidence" created a risk of erroneous deprivation, whereas a "preponderance of the evidence" standard would at least require both parties to share the risk of error). The last option for individuals such as the Fillers is to petition a district court to review the administrative decision, which is a burdensome, expensive, and onerous process.

  d. Balancing

  *Mathews* requires consideration of the risk of error in light of the individuals' interest and the government's interest. *See Hamdi v. Rumsfeld,* 542 U.S. 507, 529 (2004) ("The *Mathews* calculus . . . contemplates a judicious balancing of these concerns . . . ."). The lack of any meaningful, guaranteed procedural safeguards before the initial placement on the Central Registry, combined with the lack of any effective process for removal, violates the Filler's due process rights. Undoubtedly, Idaho has a strong interest in protecting its youngest and most vulnerable residents from abuse, but that interest is not harmed by a system which seeks to clear those falsely accused of child abuse from the state's databases. IDAPA creates too great a risk of individuals being placed on the Central Registry list who do not belong there, and then remaining on it indefinitely. Ultimately, the lack of substantive procedure available for review of Central Registry placement decisions by IDHW creates the risk of erroneous deprivation of a private interest.

  **B. Qualified Immunity**

  Having decided that the Filler's Due Process rights under the Fourteenth Amendment were violated, the Court next considers whether the individual Defendants are entitled to qualified immunity—as they assert in their Motion to Dismiss.

  The doctrine of qualified immunity protects government officials "from liability for

civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald,* 457 U.S. 800, 818 (1982). In *Saucier vs. Katz,* 533 U.S. 194 (2001), the United States Supreme Court mandated a two-step sequence for resolving government officials' qualified immunity claims. First, a court must decide whether the facts that a plaintiff has alleged (*see* Fed. R. Civ. P. 12(b)(6), (c)) or shown (*see* Fed. R. Civ. P. 50, 56) make out a violation of a constitutional right. 533 U.S., at 201. Second, if the plaintiff has satisfied this first step, the court must decide whether the right at issue was "clearly established" at the time of defendant's alleged misconduct. *Ibid.* Qualified immunity is applicable unless the official's conduct violated a clearly established constitutional right. The United States Supreme Court reconsidered the procedure outlined in *Saucier*, and while the sequence set forth there is often appropriate, it is no longer regarded as mandatory. *Pearson v. Callahan*, 555 U.S. 223, 236 (2009). The Court reiterated that lower court judges are permitted to exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand. *Id.*

Here, the Court has already determined that the allegations, as plead, illustrate constitutional deprivation. Thus, the first step is satisfied. The next question, however, is more difficult. The Fillers have not presented any evidence that this right was "clearly established" and that the named Defendants acted in blatant disregard of their rights. IDHW placed the Fillers on the Central Registry on November 20, 2019. While it is true that Judge McKee had issued a decision four months prior—in June of 2019—effectively finding that

IDHW's procedures were unconstitutional, there are no allegations in the record that *any* of the Defendants knew of that decision. More importantly, however, Judge McKee's decision, in and of itself, *cannot* create "clearly established" federal law. *See Evans v. Skolnik*, 997 F.3d 1060, 1067 (9th Cir. 2021) (explaining that federal district court decisions are not binding on other courts and do not settle constitutional questions). This reasoning is all the more apparent where, as here, it is a state, as opposed to federal, district court rendering judgment on constitutional questions. *See State v. Grist*, 147 Idaho 49, 53, 205 P.3d 1185, 1189 (2009) (explaining that only decisions from the Idaho Supreme Court and Idaho Court of Appeals are binding on lower state district courts). Thus, Judge McKee's decision in the Daniel case was specific to Daniel. It was not binding on any other court (state or federal) or even upon the same court in a different case.

The Ninth Circuit has held that "an officer who acts in reliance on a duly-enacted statute . . . is ordinarily entitled to qualified immunity" which is lost only if it is "so obviously unconstitutional as to require a reasonable officer to refuse to enforce it." *Grossman v. City of Portland,* 33 F.3d 1200, 1209–10 (9th Cir.1994). The Idaho system, which denied the Fillers their procedural due process rights, was not so obviously unconstitutional as to suggest to lay social workers that they ought not abide by Idaho Code § 16-1629(3)'s provisions, report the Fillers for listing on the Central Registry, and follow all procedural processes. Each of the Defendants' actions were consistent with the law and *did not* indicate any ill-will towards the Fillers. For example, Defendants Olmedo and Squibb's only involvement appears to be their sending notice to the Fillers of potential action against them. Defendants Unsworth and Dwello had more involvement (such as

conducting the administrative review at the Fillers' request) but there is nothing in the record to indicate they deviated from their policies and procedures.

Thus, *all* of the named Defendants are entitled to qualified immunity because the Fillers cannot show the rights at issue were clearly established at the time Defendants placed the Fillers on the Central Registry.

Furthermore, a procedural due process analysis that requires a complicated balancing test—such as the Court's analysis today—is sufficiently unpredictable that it was not unreasonable for the Defendants to comply with the duly-enacted Idaho Code § 16-1629(3) provisions. *See Baker v. Racansky,* 887 F.2d 183, 187 (9th Cir.1989). Therefore, all Defendants are entitled to qualified immunity for any damages resulting from the denial of the Filler's procedural due process rights.

## V. CONCLUSION

For the reasons described above, IDHW's application of Idaho Code Section 16-1629(3) violates the Filler's procedural due process rights, in violation of 42 U.S.C. § 1983. That said, the Court finds the Defendants are each entitled to qualified immunity for the actions complained of by Plaintiffs.

The Court understands the somewhat unique outcome in this case.[3] It has found, like Judge McKee, that IDHW's processes and procedures are unconstitutional because

---

[3] That said, such an outcome is not unusual. For example, in <u>Humphries, the Ninth Circuit reversed the District Court's decision on Summary Judgment finding there was no constitutional deprivation, but affirmed the District Court's application of qualified immunity.</u> 554 F.3d 1201–02. In other words, the Circuit found the Defendants had deprived the Plaintiff of a constitutional right, but dismissed all the individually named defendants because they were acting within the scope of their employment and the right at issue was not "clearly established." *Id.* Here, the Fillers only sued individuals. Thus, all defendants must be dismissed.

they involve little to no procedural due process. Nevertheless, this does not settle the matter (and even if it did, this decision was obviously not available to Defendants in 2020). The IDHW *may* consider altering its procedures in light of this decision (and Judge McKee's) but it is not *required* to do so until a Court of Appeals or the Supreme Court (in state or federal court) rules on the matter.

Thus, while the Court finds IDHW's actions caused the Fillers to suffer a constitutional deprivation, there are no indications in the record that those rights were so clearly established in 2020 that the individual Defendants' choices to follow Idaho statutes were undertaken with blatant disregard for the Fillers' rights. This is not a *Monell* case; the Fillers sued these *individual* Defendants in their *individual* capacities. They are, therefore, entitled to qualified immunity and this case must be dismissed.

## VI. ORDER

The Court hereby orders:

1. Defendants' Motion to Dismiss (Dkt. 16) is **GRANTED**.

2. Plaintiffs' Complaint is **DISMISSED WITH PREJUDICE**.

3. The Court will enter a separate judgment in accordance with Rule 58 of the Federal Rules of Civil Procedure.

DATED: August 23, 2022

David C. Nye
Chief U.S. District Court Judge